# CHARLESTON.

JAMES TILLMAN SALMONS *v.* NORFOLK & WESTERN RAILWAY COMPANY

(No. 5421)

Submitted September 30, 1925.  Decided October 6, 1925.

1. MASTER AND SERVANT—TRIAL—*Burden of Proving Contributory Negligence is on Employer; in Absence of Evidence of Contributory Negligence, Failure to Instruct Jury on Subject is Not Error.*

   On the trial of an action based on the Employers' Liability Act of Congress, the burden of proving contributory negligence is on the defendant; and where there is no evidence tending to show contributory negligence on the part of plaintiff, failure to instruct the jury on that subject is not error. (p. 52.)

   (Master and Servant, 26 Cyc. pp. 1420, 1492; Trial, 38 Cyc. pp. 1617, 1618, 1619).

2. DAMAGES—*Instruction Held Not Erroneous for Stating That Disease With Which Plaintiff May be Afflicted Will Not Relieve Employer From Liability for Injury, Where Evidence is Conflicting as to Cause of Permanent Injuries.*

   An instruction which limits plaintiff's recovery to the negligence of the defendant, is not erroneous in further telling the jury that some disease with which they may find plaintiff to be afflicted, then or at the time of the injury complained of, will not relieve the defendant from liability for the injury described in the declaration, where the declaration alleges permanent injuries resulting from the negligent act of defendant, and the evidence is conflicting as to the cause of such permanent injuries.  (p. 55.)

   (Damages, 17 C. J. §§ 73, 78).

   (NOTE: Parenthetical references by Editors, C. J.—Cyc, Not part of syllabi.)

Error to Circuit Court, Mingo County.

Action by James Tillman Salmons against the Norfolk & Western Railway Company. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*Holt, Duncan & Holt,* for plaintiff in error.
*Bias & Chafin,* for defendant in error.

MILLER, JUDGE:

Plaintiff's action was based on the Employers' Liability Act of Congress, for damages alleged to have accrued to him by reason of injuries sustained while in the employ of the defendant railroad company and while engaged in the performance of duties incident to his employment, due to the negligence of defendant, its agents and employees. From a judgment against it in the sum of $12,500.00, defendant obtained the present writ of error.

Plaintiff, a locomotive fireman, was one of a crew of eight men engaged in placing empty cars at various mines on a branch line of defendant's railroad, and 'collecting and bringing in to a point of distribution loads of coal from the mines. Because of steep grades on the line on which plaintiff was employed, the company had placed, between the point of distribution and the mines, three derail switches, the purpose of which was to deflect runaway cars or trains from the main track and throw them up against the mountain side, to prevent them from running into trains farther down on the track. The normal position of these derail switches was to derail cars or trains coming down from the mines; and they were so constructed that trains going up the grade forced them open, and by springs they were forced back to normal position after the train had passed. The accident causing plaintiff's alleged injuries occurred at the lower of the three switches, on his return trip with a train of loaded coal cars, when the train left the main track at that switch and ran out onto the derail track. Plaintiff's engine was at the front of the train, running backwards. The tender or tank car ran over the end of the derail track, leaving the engine on the rails. Whether plaintiff was thrown from the engine or jumped does not clearly appear.

The testimony of William Fine, one of the trainmen, is that on the way out to the mines early in the morning, under the direction of the conductor in charge of the crew, he set the lower switch open to the main track, as he says, because they thought they would return before any other train ran, and by leaving the switch open at that time, it would not be necessary to run down and open it before the loaded train returned or leave a man there. When the train load of coal was made up, plaintiff, the engineer on his engine, and brakeman Monco, on the engine, ran down to set the switches clear to the main track, before starting to move the loaded train. Monco testified that he threw all three of the switches for the main line; but further said he threw all the switches, but did not know how the lower one was set before he threw it. He said he never looked, but just unlocked it and changed it, and could not say how it was set either before or after he threw it.

The first point urged for reversal of the judgment is that plaintiff's instruction number one is erroneous. It is as follows:

> "The court instructs the jury that if from all the evidence you believe that the injury complained of by the plaintiff, James Tillman Salmons, was caused either wholly or partly by the negligence of the defendant, or the negligence of any of its officers or employees, then the defendant is liable to the plaintiff in damages and you should find for the plaintiff."

It is submitted that this instruction fails to state the law of contributory negligence as provided and applied under the employers' liability act of Congress, and ignores the element of contributory negligence as a factor in the reduction or diminution of damages. But is there any evidence of contributory negligence on the part of plaintiff? Defendant contends that as one of the crew of three sent down the track to set the switches for the main track, plaintiff was charged with the duty of observing and seeing that the switches were properly set. For this proposition the testi-

mony of plaintiff himself is mainly relied on. When asked
who told the crew, or told the brakeman or any member of
the crew on the engine, to go down and set the switches, if
any one, plaintiff answered: "The conductor told us to go
down." And he further testified: "Quest. Did you go down
and set the switches? Ans. Yes, sir. Quest. All three of
them? Ans. Yes, sir." But he says he did not get off the
engine, and did not see how Monco left the switches, because
the switch stands were not on the side of the engine occupied
by him; and he could not see whether they were lined up or
not. Monco testified: "The conductor told me to get the
engine and go down over the hill and line up the runaway
switches, and I went down and lined up the runaway switches,
and I never did see the last switch, which way it was lined
up, and then I lined them up." We do not think there is
evidence tending to show that plaintiff was under any duty
to look after or observe the adjustment of the switches. As
fireman of the engine he accompanied the crew. It is true
he said, "the conductor told us to go down;" but from that
we cannot infer that he was expected to set the switches or
assist in setting them. Monco alone threw the switches, as
testified to by him and plaintiff. Plaintiff cannot be charged
with knowing that the lower switch was set wrong, if such
was the fact; for he says he did not see it. And there is no
evidence that he was personally directed to set any of the
switches, or that his duties required him to do so, or to ob-
serve how they were set. It is to be assumed, in the absence
of evidence to the contrary, that his duties were in connection
with the engine only. The burden of proving contributory
negligence in cases under the act of Congress relied on here
is on the defendant. 1 Roberts on Federal Liabilities of Car-
riers, sec. 590; *Central Vermont Railway Co.* v. *White,* 238
U. S. 507, 512, Ann. Cas. 1916-B. 252, and cases cited. And
where there is no evidence of contributory negligence suf-
ficient to be submitted to the jury, no instruction should be
given upon that subject. 1 Roberts, sec. 586; *C. & O. Ry. Co.*
v. *Cooper,* 168 Ky. 137, 181 S. W. 933; *Fort Worth & Denver
City R. R. Co.* v. *Stalcup,* (Texas), 167 S. W. 279. Con-
tributory negligence on the part of plaintiff, under the fed-

eral act relied on here for recovery, is not a bar to recovery, but only goes to the reduction of damages; and if there is no evidence of contributory negligence from which the jury could reduce plaintiff's damages, if he is entitled to any, that question is not before them, and an instruction on the subject would only be misleading, and prejudice plaintiff's case.

The second point of error assigned and argued is that instruction number one permitted the jury to assess damages for permanent injuries, as pleaded in the declaration, while the evidence was overwhelming to the effect that plaintiff's present state of health was caused by a disease and not by his alleged injuries. This question will properly be treated in connection with the next or third assignment of error, based on plaintiff's instruction number two, given, which is as follows:

> "The court instructs the jury that although you may believe from the evidence that the plaintiff Salmons, now is, or at the time of the injury was, afflicted with some disease, still, this in no wise relieves the defendant from its liability to him for the injury sustained by him as described in the declaration and as testified about by him, if from all the evidence you believe he did sustain such injury due to the negligence of the defendant or any of its agents, or employees."

The evidence tends strongly to show that plaintiff, before the accident, and until the time of the trial, was afflicted with a veneral disease; and a number of medical experts and other physicians testified that the symptoms complained of by him might be the result of, and in the opinion of some of them, were the result of, the disease sought to be established by the evidence. It appears that the main injury directly sustained by plaintiff from the accident was a blow upon the head rendering him unconscious, and that he remained in an unconscious or semi-conscious condition for twenty-four hours, though the plaintiff says he did not know anything from Wednesday, the day of the accident, until the following Sunday; and he testified that the physician at the hospital where

he was taken immediately after the accident, and another physician who examined him later, told him his skull was fractured. A number of X-Ray photographs of his head were made, some immediately following the accident, and others at various times between that date and the time of the trial, by different physicians and X-Ray experts. There was conflict of opinion among the physicians who testified at the trial as to whether the X-Ray photographs showed evidence of a fracture. These radiographs were taken at various angles, and were explained to the jury by the physicians. One of the witnesses testified that there was in one picture an irregularity in outline of the parietal area that projected below the inner table of the skull about one-sixteenth of an inch, which he diagnosed as a depressed fracture. The physician who made the radiograph corroborated this witness in his conclusion that it showed a depressed fracture. There was other evidence of fracture; and that the physician in charge at the hospital diagnosed the injury as a fracture at the time plaintiff was taken there. We cannot agree with defendant's counsel that there was not enough evidence of fracture to submit plaintiff's theory of permanent injuries to the jury.

On the question of disease, the expert witnesses did not agree. They did not agree that the proper tests had been made, nor that the tests made and testified to were conclusive. Nor did they agree that plaintiff's symptoms, as testified to by him and others, were necessarily the result of the disease described. Some of defendant's expert witnesses admitted that the symptoms described might be the result of the injury to plaintiff's head if there was in fact a fracture. Thus it appears that either the disease or the injury might have produced the condition existing at the time of the trial, as testified to by plaintiff. No question is raised as to the competency of the expert witnesses. The defendant seems to rely on the number of witnesses who testified in its favor, to support its proposition that the evidence was overwhelming to the effect that plaintiff's permanent condition was the result of disease. Some of the witnesses said the injury would tend to aggravate the disease, if it in fact existed.

One criticism of instruction number two is that it emphatically and unqualifiedly told the jury that no disease on the part of plaintiff would relieve the defendant from its liability to him for his injury as described in the declaration, and as testified to by him. It is true this instruction did tell the jury that although they might believe plaintiff was then and at the time of the accident afflicted with some disease, that fact would not relieve the defendant from its liability to him for the injury sustained as described in the declaration and testified to by him; but it further conditioned liability on a finding that "such injury" was the result of defendant's negligence or that of its agents or employees. The injury described in the declaration was that "plaintiff was seriously, dangerously and permanently crippled, wounded, and injured, and totally incapacitated, and rendered unable to do any work, and caused to suffer great bodily, physical and mental pain." The declaration alleged permanent injury; and the jury were told by this instruction, that if they believed plaintiff sustained "such injury" due to the negligence of defendant, the presence of some disease would not relieve defendant from its liability to him. The purpose of the instruction was to advise the jury that they might find defendant liable notwithstanding plaintiff's disease, if any he had; not that the presence of the disease would determine the respective rights and liabilities of the parties, or impose liability on defendant, if the jury should believe it and not the accident caused the permanent injury pleaded. It limited plaintiff's recovery to injury caused by defendant's negligence. In *Perkins* v. *Traction Company*, 81 W. Va. 781, where plaintiff was said to be afflicted with the same disease in evidence here, a similar instruction was given, and the court held: "One suffering an injury from the unlawful act of negligence of another is entitled to recover all the damages resulting from such negligence, even though, because of his enfeebled condition, the injury to him is much more severe than would have been sustained by one in good health." In that case the criticism of two of the instructions was that they permitted the jury to assess damages in favor of plaintiff because of his present condition, regardless of what caused

such condition; and in the opinion of this court it was said the objection was not well founded, because the instructions carefully limited any recovery to damages which resulted from the injuries received by plaintiff at the time of the accident; and that it appeared there was ample evidence in the case from which the jury could find that the plaintiff was afflicted with the disease claimed by the defendant's experts, and still that such disease would never have produced his present condition but for the injuries received in the accident. This conclusion was based on the conflicting character of the expert witnesses' testimony. The evidence here is of the same general character, and was introduced into the case in an attempt to prove that defendant's condition resulted from disease and not from injuries received at the time of the accident.

As we have said, the instruction complained of limited recovery to injury due to defendant's negligence; and it cannot be said that the jury would take into consideration plaintiff's disease in determining defendant's negligence. The basis of the instruction was the evidence of disease introduced by defendant, and plaintiff was entitled to have the jury advised in the premises. In view of the fact that the instruction conditioned plaintiff's recovery on defendant's negligence, we cannot see that it could have prejudiced defendant's case in the minds of the jury.

The fourth assignment of error is to the action of the trial court in overruling defendant's motion for a new trial. It is said that the evidence fails to show the cause of the derailment of the train, or that defendant was negligent. The evidence of Fine and Monco tends strongly to prove that the lower switch was set to clear the maintrack when the train passed on the way to the mines early in the morning, and that Monco, not knowing this fact, threw it to connect the derail track by mistake. Fine's testimony is positive, and uncontradicted. Monco could not say how he found the switch, or how he left it, but was certain he changed it. It is not shown that plaintiff was aware of this fact, if true. Certainly this was evidence of negligence, when taken in connection with other evidence of the purpose of the derail

switches, and the custom prevailing in connection therewith. While it is possible the accident occurred from some other cause, there is evidence that the switch was set in wrong position, and the question was one for the jury, to be determined from all the evidence introduced on the trial.

The judgment will be affirmed.

*Affirmed.*