## Wigginton's Adm'r v. Louisville Railway Co. et al.

(Decided June 19, 1934.)

288

HUBBARD & HUBBARD for appellant.

PETER, LEE, TABB, KRIEGER & HEYBURN for appellees.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

This appeal requires a review of a trial of an action to recover of the Louisville Railway Company and the city of Louisville for the death of Everett B. Wigginton caused by their alleged negligence.

On the 12th day of October, 1922, Wigginton was traveling in an automobile on Market street in the city of Louisville, at which time and place the Louisville Railway Company maintained double car tracks.

Wigginton's cause of action is predicated on the charge the railway company and the city "had suffered and permitted East Market Street at a point about one hundred feet of its intersection with Shelby Street in said City to become out of repair and in a dangerous and defective condition, in that the surface of the street adjacent to the outside of the south rail of the east bound track of the defendant, Louisville Railway and the surface of the street adjacent to the inside of the north rail of the east bound track to become worn and defective and to sink below the surface of the street, and the rails of the said street car track to stand up above the surface of the street creating a depression along in the street adjacent to the street car rails; and that the said street had remained in this condition for a long period of time and that the defendants, and each of them, knew or by the exercise of ordinary care could have known of the existence of said defect in the street," and "on the 12th day of October, 1932, at or about the hour of 2:30 P. M., Everett B. Wigginton was driving his automobile in an eastwardly direction on Market Street and on or near the east bound track of the defendant, Louisville Railway Company, when by reason of the depression in said street adjacent to the said street car track and by reason of the rails of said track extending above the surface of the street, the automobile in which he was riding was caused to swerve and be thrown in front of a west bound Market Street car at said time and place, causing the said west bound Market Street car to strike and run·into the automobile in which he was riding, with great force and violence, hurling him to the street and inflicting such fatal injuries upon him that by reason of same he died on October 19th, 1932."

The railway company and the city filed separate answers, each traversing the petition and pleading contributory negligence of Wigginton, which were controverted by replies.

At the conclusion of the evidence offered by Wigginton's estate, the court gave a peremptory instruction; a verdict was accordingly returned and a judgment entered dismissing the petition. Wigginton's estate appeals, insisting the evidence establishes that the railway company and the city failed to keep the street along the side of the tracks of the street railway and adjacent

thereto in reasonable repair and neglected to perform this duty, and their negligence, if not positively shown, may be inferred from the facts and circumstances proven in the case. The estate argues:·

"We believe the proof in the case was sufficient to take the case to the jury at least as to the Louisville Railway Company; we prove with certainty the accident was occasioned by reason of the defective condition of the street adjacent to the car tracks. and the car tracks, themselves, stick up above the street."

A disposition of this perplexing question requires a review and an examination of the developed facts.

On the morning following the accident, Everett C. Wigginton, the father of Everett B. Wigginton, went to the scene of the accident and observed the condition of the street and the railway tracks. At that time "the rail was jagged and rough," and it was his opinion the street railway tracks were from three to four inches above the surface of the street; "there were holes there something like three or four inches wide and probably that deep, "right by the car tracks," "both tracks going east."

John Hassen described the car tracks thus: "The car track was setting up above two or three inches above the street;" "the trolley would jump off;" "there were ruts all along there;" "about two or three inches deep;" "those ruts were deep enough for an automobile to get a wheel caught in them;" "lots of machines come by there and popped like a pistol when they hit them places." Hassen witnessed the accident in which Wigginton sustained his injuries. To be accurate we reproduce the questions propounded to, and answered by, him:

"Q. I want you to go ahead and tell the jury what you saw there as to how the accident actually happened? A. As soon as it hit I ran over to the man.

"Q. Where was the street car I am talking about now before it hit? A. The street car was coming down the street in a very good speed.

"Q. On what track was the street car? A. On the westbound car track.

"Q. If the automobile was on the eastbound

car track and the street car was on the westbound car track tell the jury how they got together? A. No sooner than they got close enough to get together, the automobile jumped—jumped sideways like over in front of the street car.

"Q. Now, could you tell what caused the automobile to jump from where you were? A. Not exactly. * * *

"Q. How fast was the automobile being driven at the time? A. It looked to me like about ten or fifteen miles an hour, just leaving the intersection.

"Q. What happened to Mr. Wigginton after the automobile and the street car came together? A. He rolled out right on top of both of my feet.

"Q. What part of the street car did the automobile come in contact with? A. On the lefthand corner.

"Q. What part of the automobile struck the lefthand corner? A. The lefthand—

"Q. You mean, the automobile struck the lefthand corner of the street car? A. The left side of the automobile.

"Q. Was the right side of the automobile damaged in any way? A. No sir; not as I could see.

"Q. Now, at the point that you have described here as the track being two or three inches above the street and the rut, state whether or not that is the point that the car jumped in front of the street car? A. That is the point.

"Q. The automobile jumped? A. Yes, sir; that is the point.

"Q. How long had you observed machines passing there and which you say would pop on that rail there before the accident? A. I lived right there in that one place for four years exactly, and I would sit out there very often."

Richard Diebold was asked and answered as follows:

"Q. Did you see on Columbus Day an accident between Mr. Wigginton's automobile and a street car? A. Yes, sir.

"Q. Where were you at the time? A. I was standing in the show window of 807 East Market.

"Q. Which way were you looking? A. I was talking to Mr. Taylor; we were talking about the store room that was for rent right in front of where the accident happened, at 812; we were looking on about a forty-five degree angle.

"Q. What was the first you saw of the automobile? A. The first I saw of the accident?

"Q. Yes. A. The man was going east on Market—

"Q. Whereabouts in Market Street? A. About —when I first saw him he was about in front of 809.

"Q. I mean, with reference to the street car tracks, what part was he in? A. He was astraddle of the track, of the eastbound track; the north rail of the eastbound track, he was straddling that.

"Q. Just go ahead and tell the jury what happened. A. Well, when I seen him he was going east on Market Street; he was straddling the track there; there was a car coming west on Market Street and it looked as though he looked up; I did not see which way the man was looking; I never seen his face at all, but when I seen him the man reached up on his wheel and give it a quick turn.

"Q. What way did he turn it? A. To the south, to his right.

"Q. What happened when he did that? A. As he went over to make that turn that way; I guess it went just a few feet; I could not judge the distance, how far it was, but whatever he hit it threw him into the lefthand side of the street car.

"Q. What did he hit? A. He hit that—That rut that was along there, or hit a rock.

"Q. You don't know what he hit? A. No sir; I don't know what he hit.

"Q. Tell the condition of the street there to the jury along those car tracks. A. Well, there was a rut along the side of that track, the eastbound track.

"Q. Did or did not the track stick up above the surface of the street at that point? A. Well, the track, the bricks by the track, they were sunk a little bit on the side of the track, where it makes the track stand up it seems about two or three inches there.

"Q. Is that the point in the street he was at the time when his car jumped? A. He was right along that spot right there. [Indicating.]"

Morris Taylor was standing talking to Diebold at the time the accident occurred. He testified thus:

"Q. I want you to tell the jury what you saw? A. Well, I was facing right towards it when the machine was coming up Market Street—

"Q. Which way was the machine going? A. Going east.

"Q. Do you know whether or not it had come all the way up Market or out Shelby? A. No, I did not see that. It was coming up Market and all at once something made it swerve and it run right into the car, right into the front of the car, the front end of the car.

"Q. What part of the street was the machine in as it approached the street car? A. It looked like it was coming up on the other car track, on the south side of the car.

"Q. How close was it to the street car when it swerved towards it? A. Well, I don't know; it was just going up like any other machine would be going up the street and it looked like it just swerved.

"Q. What part of the automobile struck the street car? A. When it swerved the left fender hit it."

W. C. Fischer, a commercial photographer, early next morning after the accident, for the estate, made photographs of the scene of the accident and of the automobile in which Wigginton was traveling. It is conceded the photographs represent accurately the street car tracks, the street at the place of the accident, and the condition of the automobile immediately after the accident. The photographs of the street show a "depression" along the side of the rails extending about 18 feet east and west, varying in depth next to the rails to 1½ inches. At the time of the taking the photographs Fischer measured the depression, and by actual measurements the depression along the side of the rail was 1½ inches deep.

After the accident a piece of the rail was hanging on the automobile. Everett C. Wigginton was asked if he had pulled a piece of the rail from the track and kept possession of it, and offered it in evidence as a part of

his testimony. The court refused to admit the testimony relating to the piece of rail hanging on the automobile and also the testimony of Everett C. Wigginton in regard to his obtaining a piece of the same rail and producing it as evidence. Of this ruling Wigginton's estate complains.

The petition contains no allegation pertaining to the condition of the car rail or rails.

That which a plaintiff desires to prove as his cause or action he must first allege. The petition herein cannot be interpreted as setting up as a part of the estate's cause of action the defective or "slivered" condition of the street car rail. It was not permissible under the accepted rules of practice for the administrator to state in his petition the specific acts of negligence constituting his cause of action and enjoy the liberty of producing evidence establishing an act, additional and different to that stated in it. Mize v. Godsey, 36 S. W. 169, 18 Ky. Law Rep. 287. The evidence establishing that the street car rail was defective or "slivered," and thereby Wigginton was injured, when objected to, was inadmissible. Hignite's Adm'x v. Neuropathic Sanitorium, 223 Ky. 497, 4 S. W. (2d) 407. An issue raised by the evidence, but not made by the pleadings, is not an issue in the case, for proof without pleading is as unavailing as pleading without proof. Conley v. Boyd Oil & Gas Co., 220 Ky. 753, 295 S. W. 1025; L. & N. R. Co. v. Whitaker, 222 Ky. 302, 300 S. W. 912; Mannington Fuel Co. v. Ray's Adm'x, 250 Ky. 736, 63 S. W. (2d) 933.

It is elemental a plaintiff's pleading and proof must agree. Negligence may be alleged generally. Ill. Cent. R. Co. v. Cash's Adm'x, 221 Ky. 655, 299 S. W. 590. Under such an allegation of negligence the plaintiff may prove any acts of negligence of the defendant (Monroe v. Standard Sanitary Mfg. Co., 141 Ky. 549, 133 S. W. 214); but, where he alleges special acts of negligence (L. & N. R. Co. v. Kirby, 173 Ky. 399, 191 S. W. 113; L. & N. R. Co. v. Mitchell, 162 Ky. 253, 172 S. W. 527; C. & O. R. Co. v. Cooper, 168 Ky. 137, 181 S. W. 933; Pullman Co. v. Pulliam, 187 Ky. 213, 218 S. W. 1005; L. & N. R. Co. v. Morgan's Adm'r, 225 Ky. 447, 9 S. W. [2d] 212; Park Circuit & Realty Co. v. Coulter, 233 Ky. 1, 24 S. W. [2d] 942), or where the petition contains a charge of general negligence coupled with the specific acts of negligence, he must confine his evidence and right to

recover to the specific acts (L. & N. R. Co. v. Horton, 187 Ky. 617, 219 S. W. 1084). See American Sav. Life Ins. Co. v. Riplinger, 249 Ky. 88, 60 S. W. (2d) 115, 119, and Stacy v. Williams, 253 Ky. 357, 69 S. W. (2d) 697.

Entertaining this view, we are unable to conceive that the testimony concerning the pieces of rail in question either illustrated or tended to establish the cause of action set forth in the petition.

It is a matter of general knowledge that street car tracks in a paved street, to be serviceable for the use of the necessary wheel constructed with a flange, must, of a necessity, be embedded in the surface of the street, so as to receive the wheel for the operation of a street car.

True it is that a number of witnesses expressed the opinion that the street car tracks were above the surface of the street, about three or four inches, but the photograph and the measurement of the photographer at the place of the accident, show the rails were above the surface of the street no more than was reasonably necessary to receive the car wheels. The photographs were a part of the photographer's testimony introduced by Wigginton's estate. They, when considered in connection with the testimony of Virginia Kelly and Diebold, demonstrate very clearly that it is a matter of supposition as to whether the condition of the street, if defective as described by the other witnesses, or the "slivered" condition of the rail, was the proximate cause of Wigginton's injuries.

Miss Kelly stated: "He [Wigginton] went to make a turn [toward the south side of the street];" "from the direction of the street car;" and "something in the car track prevented him from making the turn;" "he could not make the turn;" "something prevented him in the car track;" "as he went to make the turn to the right is when he hit the street car, his left fender." The testimony of Diebold presents the same picture. He stated as Wigginton "reached up on his wheel and gave a quick turn;" "to the side, to his right;" "he went over to make the turn that way;" "it went just a few feet;" "but whatever he hit, it threw him into the left hand side of the street car;" "he hit a rut, or hit a rock, when he was about seven or ten feet from the street car;" as Wigginton "turned to his right," he, "reached up on his wheel and made a quick turn;" "he did not make the whole turn of the wheel;" "he was

traveling north of the rail of the eastbound track;" "he did not come back;" "he got out of the way, but whatever he ran into or hit, whatever it was, it threw him into the side of the car;" "it all happened so quick." This testimony shows beyond cavil that some stationary object caused Wigginton's automobile to swerve to the right, then to the left. Some of the witnesses conjectured that it was a rock or a rut that caused the machine to do so. If we were at liberty to indulge in speculation, we might surmise Wigginton was not keeping a lookout, and the sudden appearance of the street car caused him to operate the automobile too hurriedly, and in doing so his operation thereof, together with the contact of the "slivered" rail and the automobile, in some inexplicable way, caused it to swerve to the right, and then to the left into the passing street car.

Indeed, the evidence showing the "slivered rail reasonably accounts for the actions of the automobile, and strongly tends to establish that the defective condition of the street along the side of the rails was not the proximate cause of the injuries sustained by Wigginton. The fact a piece of the rail was hanging to the automobile and another part of it was so broken that Everett C. Wigginton on the next morning could remove it with his hand, when coupled with the testimony of Fischer that the depression or rut was only 1½ inches deep by actual measurement, is convincing proof to an unbiased mind, that Wigginton's injuries and death were not proximately caused by a defective condition of the street along the side of the rails. The evidence is convincing that the automobile tearing from the rail that portion of it which was hanging to Wigginton's automobile was the thing that caused the automobile to swerve to the right from the street car and then to the left into it.

Considering the fact there was hanging to the automobile a piece of the rail, it is not an extreme deduction that the defective or "slivered" condition of the rail was the proximate cause of the automobile so swerving, and that the condition of the street along the side of the track was an accompanying innocuous condition in no way responsible for the actions of the automobile and the injuries and death of Wigginton.

If the "slivered" condition of the rail, or his manner of operating the automobile, or both concurring

were not the proximate cause of the injuries and death of Wigginton, the developed facts in the light of the testimony of the last-quoted witnesses are sufficient to bring the question of the proximate cause thereof within the realm of conjecture, supposition, and speculation.

" 'Proximate cause' is that cause of an injury, which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the injury would not have happened, or it is that act or omission which immediately causes or fails to prevent the injury." Stacy v. Williams, 253 Ky. 353, 69 S. W. (2d) 697, 705. It was the duty of Wigginton's estate to establish by competent evidence, not that the dangerous or defective condition of the street might have caused Wigginton's injuries, but to establish that the same was the proximate cause thereof, as the phrase proximate cause is generally defined.

Evidence merely furnishing the basis of conjecture, surmise, or speculation does not establish proximate cause, with certitude, sufficient upon which to rest a verdict of a jury. Park Circuit & Realty Co. v. Ringo's Guardian, 242 Ky. 255, 46 S. W. (2d) 106. A plaintiff is never entitled to rest a verdict in his favor on mere supposition or conjecture; that is, on the possibility the thing could have happened, or on an idea or notion founded on the probability that a thing may have occurred, without proof that it did occur, from the acts of negligence upon which his recovery is based. City of Ludlow v. Albers, 253 Ky. 525, 69 S. W. (2d) 1051. The street railway company and the city were liable for a consequent injury for their failure to keep the street car track and the surface of the street adjacent thereto in a resaonably safe condition, but they were not required to make the same absolutely safe for travel. They were not insurers of the safety of Wigginton while traveling over the street. City of Paducah. v. Konkle, 236 Ky. 582, 33 S. W. (2d) 608.

It is an accepted rule if, on the question of negligence or no negligence, the evidence is equally consistent with either view, i. e., the existence or nonexistence of his negligence, the defendant is entitled to a peremptory instruction. L. & N. R. Co. v. Mounce's Adm'r, 90 S. W. 956, 28 Ky. Law Rep. 933; Rogers v. Felton, 98 Ky. 148, 32 S. W. 405, 17 Ky. Law Rep. 724; Ill. Cen. R. Co. v. Gholson, 66 S. W. 1018, 23 Ky. Law Rep. 2209;

Sinclair's Adm'r v. Ill. Cen. R. Co., 129 Ky. 828, 112 S. W. 910; Reliance Coal & Coke Co. v. Louisville & N. R. Co., 203 Ky. 1, 261 S. W. 609; Stanley's Adm'r v. Duvin Coal Co., 237 Ky. 813, 36 S. W. (2d) 630, 634; City of Ludlow v. Albers, 253 Ky. 525, 69 S. W. (2d) 1051, and authorities cited.

"The rule in this state is that, if the plaintiff makes out his case, however much the evidence for the defendant may overbalance that introduced by the plaintiff, he is entitled to have the jury pass upon the issue; and that the court cannot in such a case give a peremptory instruction, although he may be of opinion that, if the jury should find a verdict for the plaintiff, it should be set aside, and a new trial granted." Curran v. Stein, 110 Ky. 104, 60 S. W. 839, 840, 22 Ky. Law Rep. 1575; Irvine v. Greenway, 220 Ky. 388, 295 S. W. 445; C., N. O. & T. P. R. Co. v. Cook's Adm'r, 73 S. W. 765, 24 Ky. Law Rep. 2152; Goins v. N. Jellico Coal Co., 140 Ky. 323, 131 S. W. 28; Matlack v. Sea, 144 Ky. 749, 139 S. W. 930; Thomas' Adm'r v. Eminence Dist. Co., 151 Ky. 29, 151 S. W. 47; Stanley's Adm'r v. Duvin Coal Co., 237 Ky. 813, 36 S. W. (2d) 630, 634; City of Ludlow v. Albers, 253 Ky. 525, 69 S. W. (2d) 1051, 1054, and authorities cited. This statement of the rule is equivalent to, and no more, in form, than a reiteration of the scintilla doctrine. We have often stated that scintilla evidence means "something of substance and relevant consequence, and not vague, uncertain, or irrelevant matter not carrying the quality of proof, or having fitness to induce conviction." Crump v. Chenault, 154 Ky. 187, 156 S. W. 1053, 1057; Gay v. Gay, 183 Ky. 238, 209 S. W. 11, 14; Poll v. Patterson, 178 Ky. 22, 198 S. W. 567; White v. McClintock-Field Co., 242 Ky. 688, 47 S. W. (2d) 527.

In Gay v. Gay, it is written:
"The scintilla rule does not mean the making of something out of nothing. Mere conjecture or suspicion is not sufficient to constitute evidence."

In City of Ludlow v. Albers, we said:
"Actionable negligence may be established by circumstantial evidence as well as by positive testimony, where ti is sufficiently certain as to the proximate cause of the accident to authorize the submission of the case and upon which to rest a verdict of the jury. In every case it is the province of the

jury to determine the credibility and weight of the testimony of the witnesses establishing the circumstances, carrying the quality of proof. It is exclusively within the province of the jury to believe one witness rather than a number of witnesses in preference to another set. Edwards v. Druien, 235 Ky. 835, 32 S. W. (2d) 411; Rader v. Goe, 239 Ky. 288, 39 S. W. (2d) 486; Gayheart v. Smith, 240 Ky. 596, 42 S. W. (2d) 877; Breslin v. Blair, 249 Ky. 179, 60 S. W. (2d) 337; Fordson Coal Co. v. Osborn, 245 Ky. 539, 53 S. W. (2d) 937; McGraw v. Ayers, 248 Ky. 166, 58 S. W. (2d) 378. These familiar rules do not apply where the plaintiff's evidence and all reasonable inferences deducible therefrom merely constitute supposition or conjecture.''

L. & N. R. Co. v. Mann's Adm'r, 227 Ky. 399, 13 S. W. (2d) 257; Cochran's Adm'rs v. C. & O. R. Co., 232 Ky. 107, 22 S. W. (2d) 452; Park Circuit & Realty Co. v. Ringo's Guardian, 242 Ky. 255, 46 S. W. (2d) 106. Damages recoverable in any case must be shown with reasonable certainty, both as to their nature and in respect to the cause from which they proceed. S. H. Kress & Co. v. Sharp, 156 Miss. 693, 126 So. 650, 68 A. L. R. 167; Stacy v. Williams, supra.

In C., N. O. & T. P. R. Co. v. Zachary's Adm'r, 106 S. W. 842, 843, 32 Ky. Law Rep. 678, it is written:

''We have in this state what is known as the 'scintilla rule,' under which it is the duty of the trial court to submit the case to the jury if there is a scintilla of evidence to sustain the plaintiff's case. But we do not have the rule of letting a verdict stand upon a scintilla of evidence against overwhelming and creditable evidence to the contrary. Such an application of the rule would be an abdication of trial upon evidence in favor of trial by form. * * * In such event the duty of the court would be to withdraw the case from the jury. It is not enough to prove negligence and injury. The burden is on the plaintiff to prove negligence naturally resulting in the injury. Unless the proof connects the proven injury as a rational and proximate result of the proven negligence, there is nothing to be submitted to the jury. The absence of evidence upon any material point is as fatal to him who has the onus as the absence of all evidence

300

would be. Hughes' Adm'r v. L. & N. R. Co., 67 S. W. 984, 23 Ky. Law Rep. 2288; Hughes v. C., N. O. & T. P. R. Co., 91 Ky. 526, 16 S. W. 275 (13 Ky. Law Rep. 72); Louisville Gas Co. v. Kaufman (105 Ky. 131), 48 S. W. 434, 20 Ky. Law Rep. 1069; Wintuska's Adm'r v. L. & N. R. Co., 20 S. W. 819, 14 Ky. Law Rep. 579.''

Viewing the evidence and all reasonable inferences deducible therefrom in the most favorable light for the purpose of establishing the cause of action declared on in the petition, in the light of the principles reiterated herein, the evidence is insufficient to induce a conviction as to what was the efficient or proximate cause of the injuries to, and the tragic death of, Wigginton. It is apparent it is our view the court properly directed a verdict for the railway company and the city.

Wherefore the judgment is affirmed.